# Dent, et al. *v.* Luckett

No. 42018 December 11, 1961 135 So. 2d 840

560

*Lott & Sanders,* Greenwood; *Campbell & Campbell,* Yazoo City, for appellants.

*John Sharp Holmes, Henry & Barbour,* Yazoo City, for appellee.

562

McGEHEE, C. J.

The appellants rely for a reversal of this case on ten assignments of error but the grounds of each assignment of error will be more readily understood by a statement of what the case is about.

On November 2, 1959, the plaintiff, Danny Luckett, a young man 23 years of age, was living on his father's farm seven or eight miles southwest of Yazoo City, Mississippi, and was then employed by the Mississippi Chemical Corporation at a salary of $454.46 per month or approximately $5,500.00 per year. On the night of the accident, the plaintiff was working the midnight shift from twelve o'clock at night until eight in the morning. The morning of the accident the plaintiff had gotten off from work at eight a. m., had gone home, eaten his breakfast and had spent the day fishing with a friend. At approximately six p. m. on November 2, 1959, when it was then good dark, he was returning to his home in his 1951 Ford automobile to eat supper and sleep until time to go to work that night.

While en route home, the plaintiff was traveling in a westerly direction on a graveled country road when he met a Chevrolet pickup truck which was pulling a cotton trailer on which there was loaded three bales of loose seed cotton. The trailer immediately behind the pickup truck was 7 feet 11⅞ inches in width or approximately 8 feet wide and 14 feet long. The Chevrolet pickup truck belonged to the appellant, J. K. Dent, Sr., and was being driven by his employee, Arthur Johnson, in carrying these three bales of cotton in an easterly direction to a gin at Yazoo City, Mississippi.

The Chevrolet pickup truck had good headlights on the front thereof and these lights were burning at the time of the accident hereinafter mentioned. However, the testimony is in conflict as to whether or not there were any reflectors of other lighting devices on either the front or sides of the trailer itself, the driver, Arthur Johnson, having testified at the trial that there were reflectors on the trailer, and Mr. Dent testified that it was his best recollection that there were but he could not swear to this fact, and the plaintiff, Danny Luckett, having testified that he did not see any reflectors or other lighting devices on the trailer as the pickup truck and trailer approached him on the highway; that all he saw was the burning headlights on the front of the Chevrolet pickup truck and that from this fact he assumed that he was meeting an ordinary truck or automobile. The theory of the plaintiff was of course that if there had been reflectors or other lighting devices on the front or on the sides of the trailer or truck he would have seen them.

Section 8229-02, Sub-Sec. (d), requires that "On every semi-trailer or full trailer having a gross weight in excess of three thousand (3,000) pounds, there shall be at least the following lighting devices and reflectors: On the front, two amber clearance lamps, one at each side. On the rear, one red tail lamp; one red or amber stop

light; two red clearance lamps, one at each side; two red reflectors, one at each side. On each side, one amber side-marker lamp, located at or near the front; one red side-marker lamp, located at or near the rear; one amber reflector, located at or near the front; one red reflector, located at or near the rear."

Section 8229-07, Sub-Sec. (b), provides that "Every reflector shall be of such size and characteristics as to be readily visible at night from all distances within five hundred (500) feet to fifty (50) feet from the motor vehicle when directly in front of a normal headlight beam."

To either send or drive a heavily loaded and unlighted trailer down the highway after dark without any reflectors or other lighting devices thereon where such trailer is approximately eight feet in width and towed by a pickup truck only 6 feet 4 inches wide, and on a well-traveled gravel country road from 21 feet to 23 feet in width would, in our opinion, amount to common law negligence.

The plaintiff did not choose to submit the case to the jury under instructions based on these statutes but rather upon the theory that the defendants were guilty of negligence in driving this pickup truck and trailer on a graveled country road from 21 feet to 23 feet in width after dark and meeting and passing other traffic on the highway without any reflectors or other lighting devices to inform the oncoming motorists that the pickup truck was pulling an unlighted trailer of sufficient width to carry three bales of loose seed cotton.

It was the theory and contention of the plaintiff, Danny Luckett, that although he was partly on his wrong side of the road when he first saw the Chevrolet pickup truck which was pulling the trailer as aforesaid approximately five hundred feet ahead of him, he nevertheless immediately got back on his side of the road and then proceeded toward the oncoming pickup truck and trailer,

and that he passed the Chevrolet pickup truck without incident and that then his Ford automobile ran under the protruding side of the trailer after passing the pickup truck and that this trailer turned back the windshield of his Ford automobile and badly crushed him therein and severely injured and damaged him in the manner to be hereinafter stated.

On the other hand, the defendant, Arthur Johnson, who was driving the Chevrolet pickup truck to which the loaded cotton trailer was attached, testified he remained on the south or his right side of the road at all times when approaching the Ford automobile of the plaintiff; that he brought his truck and trailer to a stop within three feet after the accident and that his pickup came to rest near the ditch on the right or south side of the road and that the trailer came to rest partly in the ditch to the right or south side of the road; and the said Arthur Johnson therefore contended that the plaintiff was on the wrong side of the road when the accident occurred, just as the plaintiff contended that he, Arthur Johnson, was on the wrong side of the road at the time of the accident. Thus it will be seen that the case was one peculiarly for the determination of a jury.

It was conceded at the trial by the driver of each vehicle that they both dimmed their lights when meeting each other and it was contended by the appellee, Danny Luckett, that when his automobile was brought to rest it was within 1½ feet of the ditch on its side of the road. The proof shows that the automobile turned completely around and was headed back in the direction from which it came when the accident was over. The appellants contend that it was wholly an impossibility for the plaintiff's automobile to have turned completely around without getting in the ditch on one side or the other of the graveled road. But we think that this was a matter for the consideration of the jury based upon their own experience and observation.

The jury evidently didn't accept at full value the testimony of the drivers of either of the automobiles and believed that they both could not have been on the same side of the road and have passed each other. In other words the jury had the right to believe, and evidently did believe, that each of the vehicles was partially on its wrong side of the road.

The appellants requested and obtained an instruction on contributory negligence and we are not warranted in assuming that the jury did not give full consideration to this instruction by failing to reduce the damages according to any contributory negligence of the plaintiff, if the jury believed that the plaintiff was guilty of contributory negligence.

On the other hand if the jury believed that the plaintiff was on his side of the road at the time of the accident, and that the accident was without fault on his part, then it was not the duty of the jury to reduce the damages to any extent that had been suffered by the plaintiff.

Again on the question of whether or not there were reflectors or other lighting devices on the trailer, it should be observed that the endgate on the front of the trailer was knocked off in the collision and was covered up by the loose cotton that spilled out the front of the trailer. And although there were many photographs taken at the instance of the defendants at the scene of the accident on the next day after the accident, it may have been significant to the jury that the endgate which did not show any reflectors on the upturned portion thereof was not turned over and a picture or pictures made of the side thereof which had been resting on the graveled road. If this had been done, it could have thereby been clearly ascertained whether or not there were any reflectors on either side of this endgate, and such fact would have had a vital bearing on the issue as to whether or not there were any reflectors at all anywhere on the trailer. Moreover, there were four other Negroes on

the pickup truck with Arthur Johnson, to-wit: Horace Johnson, his nephew, Arthur Johnson, Jr., his son, and a Negro named McCollum and a Negro named Marshall Simpson. None of these persons were introduced as witnesses and their failure to testify as to whether or not there were any reflectors or other lighting devices on the trailer may have had an influence with the jury.

But it is strenuously argued that there was no causal connection between the absence of reflectors or other lighting devices on the trailer and the happening of the accident, but that was an issue for the determination of the jury and the jury resolved the issue against the defendants.

 Taking up the assignments of error on this appeal in the order stated, it is first contended that the trial court erred in requiring the appellants to produce and exhibit to the appellee in advance of the trial any and all photographs in their possession, and which the defendants had evidently caused to be taken at their own expense and for their own use in preparing to defend the case. Four of the photographs were taken under the instructions and supervision of one of the defense attorneys, and as "the good cause shown" for requesting such an order from the trial court the reason assigned was that the plaintiff had been continuously in the hospital most of the time for several weeks after the accident and that he was therefore in no condition to see about having photographs made of the scene at or near the time of the accident or could be present and advise and give instructions as to any photographs that may have been material to the issues of the case; and that moreover, the photographs in the possession of the defendants were evidently taken in order that they could be introduced upon the trial by the defendants and that in fact some of them were introduced and that no prejudice was shown to the defendants from the fact that the trial court ordered that the same be produced and ex-

hibited to the appellee in advance of the trial. Of course a motion or petition to the trial court to require photographs to be produced and exhibited to the adversary should be more specific as to what particular photographs were desired to be produced and as to what such photographs would portray. The motion or petition in the instant case may not have complied with the purport and intention of the statute in question, Sec. 1659, Code of 1942. But we do not feel justified in reversing the case for a new trial on this ground under all the facts and circumstances.

■■■ The hearing on the motion to require defendant to exhibit to appellee all of said photographs took place in chambers. A lengthy discussion between the attorneys and the judge is shown in the record. It does not appear that appellants' attorney ever asked for any specific ruling as to whether five of said photographs which were taken under the attorney's supervision, constituted the "work product" of said attorney. It appears to us that what appellee's attorneys sought by their motion was to obtain authority to examine the photographs taken by appellants' insurance company the morning after the accident and before any attorneys were employed. The photographs later taken under supervision of appellants' attorney apparently were never segregated for separate ruling, and in our opinion the circuit judge did not consider the matter from the standpoint of the five photographs last taken as being the work product of the attorney under whose supervision they were taken.

■■ ■ The second ground assigned as error was the action of the trial court in permitting an engineer to submit in evidence a plat made of a section of the road at the scene of the accident and which plat in addition to showing the width of the traveled portion of the road also disclosed a centerline to indicate the location of certain alleged ruts on the graveled road which were

in fact places made by the tires of vehicles passing along the road, the plat having been made by the witness five months and twenty-one days after the accident and which the witness claimed to be a fair representation of the graveled road and the location of the ruts or smooth and flat places made by motor vehicle tires thereon as of the time of the accident. The witness was corroborated by the positive testimony of the plaintiff to the effect that the plat so made subsequent to the accident was a fair representation of the location of what it portrayed as of the time of the accident. We think that the plat was admissible in evidence for whatever it was worth and that the fact that it was made sometime after the accident as representing a fair presentation of the situation as it existed at the time of the accident would affect the weight to be given to the testimony of the engineer and the plaintiff rather than the competency of the plat as evidence. Therefore we would not reverse the case on that ground under all of the facts and circumstances.

Assignments of error Nos. 3, 4, 5, 7, 8 and 9 all deal with the issue as to whether or not the defendants were entitled to a directed verdict in their favor or whether or not the verdict is contrary to the overwhelming weight of the evidence. We think that the foregoing statement of the case answers these assignments of error.

Assignment No. 6 is that the verdict of the jury is so grossly excessive in amount as to evince bias, passion and prejudice on the part of the jury. The plaintiff was confined in the Kings Daughters Hospital in Yazoo City, Mississippi, from November 2, 1959, to November 10, 1959, during which time traction was applied to his broken leg in an attempt to pull the bone fragments in line. The plaintiff was then transferred to St. Dominic's Hospital, Jackson, Mississippi, and was confined there from November 10, 1959, to December 22, 1959. During this time there was an operation performed to place a

pin through the bone of the left leg below the knee. A traction apparatus was attached to this pin in an effort to pull the bone fragments into line. In addition, a large portion of the plaintiff's body was put in a cast and on December 22, 1959, the plaintiff was again transferred to the Kings Daughters Hospital in Yazoo City, Mississippi, and he remained there until December 30, 1959. His attending physician deemed that the treatment thus applied was not achieving satisfactory results and that a further operation was necessary. The plaintiff was then transferred again to St. Dominic's Hospital, Jackson, Mississippi, on December 30, 1959, and he remained there until January 13, 1960. During this period the old cast was removed, the pin below the left knee was removed; an operation was performed on the leg; the bone fragments were pulled down and a pin was inserted at the hip, through the side of the fracture to the knee. This pin that was thus inserted was too long and protruded into the tissues and muscles of the hip. On January 13, 1960, the plaintiff was transferred again to Kings Daughters Hospital at Yazoo City, and remained there until February 1, 1960. During the last week of his confinement in the hospital in Yazoo City he was, for the first time, allowed to be in a wheelchair. During all of the balance of the plaintiff's hospitalization he was kept entirely immobile, was moved only by picking up the sheet on which he lay, moving the entire body and then slipping the sheet out from under the patient. On February 1, 1960, the patient was allowed to return to his home where he was confined to a wheelchair until March 15, 1960. Since March 1960, he has had to use crutches and a cane to move about. The plaintiff himself testified that he "hurt as bad as anyone can hurt without dying". Mrs. Luckett, the plaintiff's mother, stated that the patient writhed and twisted in his pain and that he rubbed big blisters on his instep, twisting it in the foot traction. Mr. Luckett, the plaintiff's father,

said that he "never saw anybody suffer any more". The plaintiff required great amounts of narcotics for pain during his entire hospitalization. His physician said that extensive medication of this nature was required. It was also shown that the plaintiff suffered much pain in his left knee and that immediately below this knee a steel pin was placed through the bone and traction was applied in an attempt to bring the bone fragments in the upper leg into place, and that this resulted in extreme pain to the plaintiff's left knee.

The record also discloses that other ailments were undergone by the plaintiff such as a disturbance in his vision due to a head injury that he sustained in the accident, that the plaintiff was unable to see to read and that this difficulty with his vision had persisted to the time of the trial; that the plaintiff suffered extensively with abdominal pains; that the head injury produced repeated severe headaches to the time of the trial and that the withdrawal of opiates caused the plaintiff to be extremely nervous.

The medical expenses and hospital bills incurred by the plaintiff amounted to the sum of $6,116.60; that the loss of wages at $454.46 per month would amount to approximately $11,000.00 by the time his contemplated treatment was completed; and that upon reaching maximum improvement the plaintiff would still have two-thirds permanent limitation in his left knee due to the fracture and prolonged traction. His left leg was one inch shorter than his right and the medical testimony discloses that this is a permanent condition and that he would have a fifty per cent permanent disability to his left leg.

The medical testimony also discloses that immediately following the accident the plaintiff's blood pressure fluctuated from a very high blood pressure to a very low blood pressure indicative of a severe head injury and that the doctor at first did not think that the patient

would live. In answer to a question of appellants' attorney as to what success he had had in correcting the various conditions of the patient as hereinbefore outlined, the doctor responded, "Well, the greatest success that we have had is that the patient is in the courtroom."

The proof further disclosed that the plaintiff would have permanent facial scars and a permanent personality change.

■■■ It is to be conceded that the verdict in the sum of $65,000 is a large verdict, and we are conscious of our duty to affirm a verdict in a proper case if not excessive and that it is our duty in some instances to order a remittitur to be entered where a verdict is manifestly excessive, but in this case it is difficult to conceive how any man could have been so severely injured and still be alive or that he could have suffered any more than the proof shows that this plaintiff did suffer. ■■ ■ Therefore, we do not feel justified in holding that the verdict under all the facts and circumstances of this particular case is so excessive as to shock the enlightened conscience of the Court. We think that the verdict as rendered in the sum of $65,000 should be affirmed.

■■■ Finally, the appellants contend that they were entitled to have their motion for a new trial sustained on the ground of newly discovered evidence. They had pled as an affirmative defense that the plaintiff was driving his Ford automobile on the occasion complained of while under the influence of intoxicating liquor. They were unable to make any competent proof to sustain this affirmative defense during the trial of the case. One Calvin O'Reilly made an affidavit to the motion for a new trial and to the effect that the appellee, Danny Luckett, had been drinking intoxicating liquor just prior to the accident and was visibly under the influence of the same. This was denied by the plaintiff who testified that he had had no intoxicants to drink on the day of the accident at all and he was corroborated by other wit-

nesses on this issue and none of the companions of Arthur Johnson supported this contention, or any other persons present at the scene of the accident, except two witnesses who testified that they detected an odor of intoxicating liquor in the plaintiff's automobile after the plaintiff had been removed from the automobile and was in the hospital.

The testimony of Calvin O'Reilly would have been merely to impeach the positive testimony of the appellee that he had not had any intoxicating liquor to drink, and moreover the rule is well settled under the authorities that the newly discovered evidence must be such as to probably change the result if a new trial is granted. We think that the trial court was warranted in concluding that it was not probable that a different result would have been obtained in another trial. We are unable to say that the trial judge abused his discretion in overruling the motion for a new trial.

The judgment appealed from must, therefore, be affirmed.

Affirmed.

*Kyle, Gillespie, McElroy,* and *Jones, JJ.,* concur.